| | |
|---|---|
| Bryan E. Sheppard | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:17-cv-1037 |
| United States Department of Justice | ) ) |
| Defendant | ) ) ) |

Plaintiff Bryan Sheppard ("Plaintiff") brings this action against the Department of Justice ("DOJ") and its component agencies ("Defendant") that include, but are not limited to, the Office of Information Policy ("OIP"); the Criminal Division and its Office of Enforcement Operations; the Federal Bureau of Investigation ("FBI"); the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"); and the Office of the U.S. Attorneys.

**NATURE OF THE ACTION**

1. This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking agency records improperly withheld by Defendant.

2. The improperly withheld agency records concern a review by the Defendant's Criminal Division into reports by the *Kansas City Star* ("*Star*") that federal investigators engaged in misconduct during the investigation of the 1988 arson that killed six Kansas City firefighters. In 1997, five individuals were convicted of arson and sentenced to life in prison for the crime.

3. The arson literally and figuratively shook the Kansas City community. The *Star*'s allegations, which were based on voluntary statements by multiple members of the community,

raised significant public interest in the government's handling of this case with respect to whether legal and proper steps were taken to prosecute all of the individuals who were actually responsible for that arson.

4. In July 2008, the U.S. Attorney for the Western District of Missouri, John Wood, announced to the public that Defendant's Criminal Division would review the *Star*'s allegations. After three years, the Criminal Division team finalized its review, memorialized in a July 8, 2011, memorandum ("Memorandum").

5. In April 2016, Plaintiff filed a FOIA request to obtain a copy of the Memorandum and related documents. Defendant provided only a highly redacted copy and a few pages of redacted email correspondence, citing various FOIA exemptions without explanation. The records produced offer little more than the fact that the *Star*'s allegations had been reviewed and the conclusory statement that no credible support for the allegations had been found.

6. This case is not about whether the *Star*'s allegations are indeed true or whether the five individuals convicted of the 1988 arson are actually innocent. Instead, it is about whether a federal government agency reviewing the actions of its own investigators and prosecutors, should be allowed to conclude unilaterally, without any public review or accountability, that the agency and its personnel have done nothing wrong.

7. If the Defendant is confident that its investigators and prosecutors have done nothing wrong, as it concluded in its Memorandum, then disclosing the full records related to the review would further the public interest in knowing the truth about the 1988 arson. Moreover, it would further the public interest that prompted the review in the first place, namely, Attorney Wood's assurance that "justice is served in every case." It is therefore precisely the type of injustice FOIA is intended to address.

## THE PARTIES

8. Plaintiff Bryan E. Sheppard resides at 4522 N. Mulberry Ct., Kansas City, Missouri 64116.

9. Defendant is a Department of the Executive Branch of the United States Government. It is an agency within the meaning of 5 U.S.C. § 552(f). Its principal office is located at 950 Pennsylvania Avenue, NW Washington, District of Columbia, 20530-0001.

## JURISDICTION AND VENUE

10. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

11. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## FACTUAL ALLEGATIONS

**I. The 1988 arson and investigation**

12. In the early hours of November 29, 1988, two fires occurred at a site in southeast Kansas City where 71 Highway was being extended. The first fire was on the east side of the highway in a truck owned by one of the construction site security guards, Deborah Riggs. She and her brother, Robert Riggs, who owned the security company, contacted the Kansas City Fire Department to report the fire.

13. The firefighters who arrived on the scene quickly extinguished the first fire in the guard's truck, but a second fire had started on the west side of the highway. This fire was in a trailer containing 25,000 pounds of ammonium nitrate and fuel oil, which were used by the construction company to blast through the bedrock and clear the area for the highway.

3

14. When the firefighters attempted to extinguish it, the trailer exploded, instantly killing six firefighters – Captain Gerald Halloran, Captain James H. Kilventon, Robert D. McKarnin, Michael R. Oldham, Thomas M. Fry, and Luther E. Hurd.

15. This first explosion caused a second trailer containing ammonium nitrate and fuel oil to explode. These explosions were heard up to 50 miles away and caused craters 100 feet in diameter and 8 feet deep. More than 1,300 businesses and individuals within a 10-mile radius would claim property damage from these explosions.

16. At various times in the criminal case that ensued, it would be stated that the entire Kansas City community was a victim of the arson because of its wide impact.

17. A memorial for the six firefighters was held at Arrowhead Stadium and attended by 15,000 people. To date, the explosion is one of the worst tragedies in Kansas City history and led to the construction of the iconic Firefighters Fountain in midtown.

18. The Kansas City Police Department, the ATF, the FBI, and the Department of Labor began an investigation into the cause of the fires, which was immediately suspected as arson. Several theories were explored. Initially, investigators pursued theories that the security guards or organized labor were responsible. The investigation, however, would languish unsolved for several years.

19. The investigation was revived in 1994, and in 1995, investigators landed on five individuals from a neighborhood near the construction site – Richard Brown, Darlene Edwards, Frank Sheppard, Skip Sheppard, and Bryan Sheppard.

20. The government's theory was that these individuals had gone to the construction site to steal tools and equipment in order to buy drugs, and then set the fire either as a diversion or out of malice. However, as Judge Stevens observed in denying the defendants' motion for a

4

new trial, no physical evidence linked any specific defendant to the scene and there were no eyewitnesses to the offense. Rather, the government's case depended on Darlene Edwards' confession and piecing together more than 50 informant witnesses.

21. All five individuals were convicted of the arson and sentenced to life in prison.

## II. *Kansas City Star* reporting and Defendant's "review"

22. While the conviction of the purportedly responsible parties should have provided closure to the Kansas City community, questions about the case have persisted. Members of the public familiar with the facts in the case have frequently spoken to the press about their concerns regarding this case and how it was investigated. Public figures – notably U.S. Representative Emmanuel Cleaver and U.S. District Judge Scott O. Wright – have expressed both concern about the handling of this case and support for reopening the investigation.

23. On Sunday, June 29, 2008, the *Star* reported that numerous witnesses who testified at trial now claimed the federal investigators pressured them to lie. Others claimed their statements to the federal investigators were ignored because they did not align with those of other witnesses who were either coerced or incentivized with money or reduced jail time.

   a. **Joe Denyer** claimed he testified at trial that he heard defendant Darlene Edwards admit she was near the construction site only because federal investigators offered to help him with legal problems while in jail;

   b. **Beckie Edwards** claimed she testified at trial that she heard the defendants planning the theft only because federal investigators threatened her with drug charges;

   c. **Carie Neighbors** claimed she testified at trial that she overheard defendants Bryan Sheppard and Richard Brown admit to the crime at a party, but only because federal investigators threatened to prosecute her for contempt and take away her child;

   d. **Shannon Reimers** claimed she testified at trial that she saw defendants Frank Sheppard and Darlene Edwards at home, fully dressed in the middle of the night of the explosion, because federal investigators intimidated her;

5

e. **Jerry Rooks** claimed he testified at trial that Richard Brown admitted his involvement to him, but only because federal investigators threatened him with more prison time for violating his probation;

f. **Alan Bethard** claimed federal prosecutors moved his state auto theft charge to federal court because he refused to corroborate Ronnie Edwards' story;

g. **Jack Clark** claimed he lied to the grand jury about Frank Sheppard asking him to steal from the construction site because federal investigators pressured him;

h. **Dixie Cloughley** claimed federal investigators pressured her to incriminate defendants;

i. **Dave Dawson** claimed he lied to investigators in exchange for help with his own criminal charge, but when he recanted they charged him with several robberies he claimed he did not commit;

j. **Mike DeMaggio** claimed federal investigators threatened him with additional jail time if he refused to implicate the defendants;

k. **Johnny Driver** claimed that federal investigators threatened to charge him with the arson if he refused to implicate Bryan Sheppard;

l. **Ronnie Edwards** claimed federal investigators pressured him to say he saw defendants near the construction site and heard two of the defendants admit to the arson;

m. **Buster Hower** claimed when he refused to help federal investigators, they made repeated appearances at his business to intimidate him;

n. **Ella Hutton** refused a request by federal investigators to change her story about Richard Brown being in another place at time of arson that conflicted with other witnesses;

o. **Chuck Jennings** claimed federal investigators threatened to charge him with past crimes if he testified in defense of Bryan Sheppard;

p. **Deborah Foster** claimed federal investigators pressured her to change her story that Bryan Sheppard was in bed with her night of arson;

q. **Valerie Rocha** claimed federal investigators offered her $400 for drug rehab to say she overheard Bryan Sheppard and Richard Brown discussing the arson, but she recanted before testifying to grand jury;

r. **Patti Smith** testified that she heard Skip Sheppard admit to the arson but investigators ignored her statement that Bryan Sheppard was innocent;

    s.    **Larry Summers** claimed federal investigators pressured him to change his story that Bryan Sheppard visited the construction site for the first time after explosion.

24.    The following Tuesday, July 1, 2008, U.S. Attorney John Wood announced that because of the *Star*'s claims, he was asking the DOJ to appoint a team to investigate:

> "Sunday's Kansas City Star article indicates that some individuals have called into question their own prior statements regarding an arson case that my office tried in the 1990s. This case was handled by experienced and highly professional agents and prosecutors. We have every confidence in their work, which was reviewed on appeal and in subsequent collateral litigation. But our paramount goal is to ensure that justice is served in every case. We should ensure that all evidence is carefully considered. In order to ensure that these new assertions are reviewed and considered in a thorough and unbiased manner, on Monday morning I requested that the Department of Justice designate an attorney outside the U.S. Attorney's Office to review the assertions. We will fully cooperate with this review in order to assure that justice is served."

25.    In its Memorandum three years later, the Criminal Division's review team concluded that:

> "The Criminal Division's review of the prosecution focused on whether the allegations raised in the *Star* are supported by evidence. The review was not, and was not intended to be, a re-investigation of the arsons. Rather, the review was intended to address the *Star*'s assertions that the defendants may have legitimate claims of actual innocence. Based on the information obtained during its review, the review team did not find any credible support for the *Star*'s allegations." (Memorandum at 2.)

26.    The review team did not interview all of the individuals who had spoken to the *Star*, either because the individuals could not be located or because they declined to meet with federal investigators. However, the Defendant has not released the names of individuals interviewed or the subjects of those interviews.

27. On page 7 of the Memorandum, the review team stated:

> The *Star* identified five trial witnesses who allegedly falsely implicated the defendants: Joe Denyer, Becky Edwards, Carie Neighbors, Shannon Reimers, and Jerry Rooks. Two of these individuals ████████████████ were located and agreed to be interviewed.[4] Notwithstanding the reporting in the *Star*, both of these witnesses confirmed that they had testified truthfully.

28. And on page 9 of the Memorandum, the review team stated:

> The *Star* reported that the government, and in particular Special Agent True, attempted to coerce numerous individuals who did not testify at trial, allegedly for the purpose of persuading them falsely to implicate the defendants or to dissuade them from exculpating the defendants. In addition to defendant Darlene Edwards and ████████████████████████████ – Joe Denyer, Becky Edwards, Carie Neighbors, Shannon Reimers, and Jerry Rooks – and a sixth, Ella Hutton, ████████████████████ – the *Star* identified the following 12 other individuals – none of whom testified at trial – as allegedly having been pressured in this manner: Allen Bethard, Jack Clark, Dixie Cloughley, Dave Dawson, Michael DeMaggio, Johnny Driver, Ronnie Edwards, Buster Hower, Chuck Jennings, ████████████████ Valerie Rocha, and Larry Summers. The review team interviewed 8 of these 12 individuals, namely: ████████ ████████████████████████████████.[5] The team also interviewed numerous current or former law enforcement officers who had worked at various times on the investigation – all of whom reported that neither Special Agent True nor AUSA Becker placed undue pressure on witnesses or otherwise strayed from the bounds of professional conduct during the investigation and prosecution.

29. The report stated that the two trial witnesses reaffirmed their testimony and there was no evidence of inappropriate investigative techniques. There were no credible instances of undue pressure and the witnesses possessed no relevant information that was unavailable to the defense team prior to trial.

30. Most remarkable of all, despite the repudiation of the *Star*'s claims, the review team found evidence "not previously known to the prosecution" suggesting that two other individuals may have been involved in the arsons. However, the Defendant's review team unilaterally determined – i.e., not a court, jury, prosecutor or defense counsel – that this "newly-developed information would not have called into question the defendants' guilt of the crimes charged." (Memorandum at 19.)

8

31. Six years later, those two additional individuals who may share responsibility for one of the worst tragedies in the Kansas City community have never been revealed or prosecuted.

32. In that time, interest in the case has continued in the Kansas City community. For example, in 2016, the Living Room Theater Company in Kansas City put on a play about the arson that ran for a month to sold-out audiences. On several occasions members of the audience came forward afterward to discuss their knowledge of the case.

33. Attention to the case by the media and community was further heightened because, in March 2017, Plaintiff was released from prison. The Supreme Court's decisions in *Miller v. Alabama*, 567 U.S. 460 (2012) and *Montgomery v. Louisiana*, 577 U.S. __ (2016) held that a juvenile may not be sentenced to life without parole. Because Plaintiff was a minor at the time of the arson in 1988, he was resentenced to twenty years. Crim No. 96-00085-04-CR-W-FJG.

### III. Plaintiff's FOIA request and exhaustion of administrative remedies in response to Defendant's failure to respond adequately

34. On April 7, 2016, Plaintiff contacted the DOJ's Freedom of Information Chief, Kenneth Courter, and requested an opportunity to copy and inspect public records including and related to the July 8, 2011 Criminal Division Memorandum prepared by P. Kevin Carwile, James Trusty, and John F. Cox III. He additionally requested "all notes, recordings, and transcripts pertaining to the Inspector General's investigation that produced that memorandum."

35. Defendant's Office of Enforcement Operations responded to Plaintiff's request on November 29, 2016. Defendant's agent Amanda Marchand Jones stated that 450 pages were located that are responsive to Plaintiff's request. Of these, only three pages were considered

appropriate for release in full, thirty-five pages were appropriate for partial release, and 412 pages were exempt. The exemptions cited were:

> "5 U.S.C. § 552(b)(5), which concerns certain inter-agency or intra-agency communications protected by the deliberative process privilege, the attorney work-product privilege, and/or the attorney-client privilege;
>
> 5 U.S.C. § 552(b)(6), which concerns material the release of which would constitute a clearly unwarranted invasion of the personal privacy of third parties;
>
> 5 U.S.C. § 552(b)(7)(C), which concerns records or information compiled for law enforcement purposes the release of which could reasonably be expected to constitute an unwarranted invasion of the person privacy of third parties; and
>
> 5 U.S.C. § 552(b)(7)(D), which concerns records or information compiled for law enforcement purposes the release of which could reasonably be expected to disclose the identities of confidential sources and information furnished by such sources."

36. The pages released include 20 pages of email correspondence – provided as PDFs, not native files – among the review team indicating the transference of attachments such as memoranda of investigation ("MOI"), witness interview reports, and other documents.

37. None of these attachments was provided and in many cases even the names of the attachments were redacted.

38. In most cases, either the sender or the recipient of the email is redacted. The only name left unredacted is that of John Cox, with the one exception of Kevin Carwile.

39. The 20 pages of emails are as follows:

a. August 5, 2009, which states in the body of the email "All of the civilian witness interview reports" and attaches 11 MOIs;

b. December 15, 2009, which states "Two More. These are short ones." and attaches two MOIs;

c. April 14, 2009, which states "Is this the summary you're looking for?" and forwards an email from September 12, 2008 that attaches a "witness list";

d. March 8, 2011, which states "[Redacted] report attached. Please review and we'll discuss when we talk this afternoon [redacted]. Thanks." and attaches one MOI;

e. March 21, 2011, the entire body text of which is redacted and one MOI is attached;

f. March 21, 2011, a second email in which the entire body text is redacted;

g. April 20, 2011, which states "[Redacted] pulled these from the [redacted] file." and contains unknown attachments;

h. January 4, 2010, which states "[Redacted] John" and attaches one document titled "KC.Findings.doc";

i. October 22, 2010, which forwards an email dated February 4, 2010 and states "[Redacted] John" and attaches one document titled "Kansas City Firefighter.Report.doc";

j. February 18, 2010, which attaches one document titled "Kansas City Firefighter.Report.0217.doc";

k. January 15, 2010, which attaches one document titled "KC.Final.doc";

l. February 23, 2011, the entire body text of which is redacted and forwards an email dated April 14, 2009 that states "Attached are my interview reports. I'm looking for the other document you asked me about. Will work on scheduling interviews for the week of May 4th." and attaches 16 MOIs;

m. September 13, 2010, which states "Does this sound okay? If so, I will submit to my supervisor for approval. Thanks." It attaches one MOI and forwards three other emails with the same date that say "Thanks for checking, call when you can."; "Yes."; "[Redacted]" and a large redacted area that simply says "Bryan – 3/5/71" and "Hope this helps.";

n. July 30, 2009, which states "John, [Paragraph redacted] Have a good night, [Name redacted]" and attaches seven MOIs;

o. December 7, 2009, which states "I'm working on the others. Hope you are doing well." and attaches one MOI;

p. December 28, 2009, which includes a large redacted area in the body text and attaches one MOI;

q. June 2, 2009, which states "Hi John, How are you? Hope all is well. Attached are the latest reports, with the exception of [redacted]. Just need to get some clarification on that one. [Redacted paragraphs] [Redacted name]." and attaches six MOIs;

11

r.  December 4, 2008, which states "Attached are the Kansas City Witness contacts. It was great working with you, best of luck! [Name redacted] Intern Gang Unit Criminal Division U.S. Department of Justice" and attaches one document titled "KANSAS CITY WITNESSES CONTACT.doc";

s.  December 4, 2008, which states "Here's what I have.  John" and attaches one document titled "KANSAS CITY WITNESSES CONTACT.doc"; and

t.  April 14, 2009, which states "Attached are my interview reports. I'm looking for the other document you asked me about. Will work on scheduling interviews for the week of May 4th." and attaches 16 MOIs.

40. The next 20 pages disclosed represent the July 8, 2011, Memorandum by the DOJ review team titled "Review of *Kansas City Star* Allegations Regarding the Prosecution of <u>United States v. Sheppard, et al.</u> (The Kansas City Firefighters Case)".

41. As noted above, the review team concluded that it found no evidence to support the *Star*'s allegations. The evidence that was reviewed and that led the team to this conclusion, however, is redacted. Not only are the names of the witnesses redacted, nearly all of the paragraphs summarizing the interviews with those witnesses are also redacted. Pages 14 and 15 of the Memorandum are redacted in their entirety.

42. Next to each redaction in the Memorandum is an annotation of the statutory exemption relied upon – e.g., "(b)(6), (b)(7)(C)" or "(b)(7)(D)." No further explanation or justification is given.

43. On page 6 of the Memorandum, it states that the review team relied on the files of the U.S. Attorney who prosecuted the case, Paul Becker, which reportedly amounted to nearly 40 boxes; approximately 4,000 pages of transcript from the 1997 trial of the five defendants; and post-trial affidavits by individuals who either recanted their trial testimony or asserted they had additional information about the arson.

12
Case 4:17-cv-01037-ODS   Document 1   Filed 12/15/17   Page 12 of 18

44. Given that the review is in response to the reporting in the *Star*, presumably the team would also have had in its files, the relevant newspaper articles to guide the review.

45. In addition, Pat O'Connor, a former journalist in Kansas City, claims to have given a member of the review team, Pam McCabe, a 30-page summary of the case. He also claims to have provided her with affidavits from Becky Edwards, Alan Bethard, Joe Denyer, Larry Summers, Shannon Reimers, Buster Hower, and Carie Neighbors, and the letter Deborah (Foster) Howard had written about Plaintiff being home asleep at the time of the explosions. Mr. O'Connor further claims that he frequently exchanged emails with Ms. McCabe about the case and helped connect her to several of the witnesses interviewed by the review team. All of these documents and correspondence would presumably be in the review team's files.

46. Unsatisfied with the incompleteness of the records provided and their heavy redaction that offers no information about what the government was up to in its review, Plaintiff appealed the decision of Ms. Amarchand Jones on December 21, 2016.

47. On February 27, 2017, the Defendant's Office of Information Policy denied Plaintiff's appeal and stated his right to file a lawsuit in federal court in accordance with 5 USC § 552(a)(4)(B).

## PLAINTIFF'S CLAIM FOR RELIEF

**I. Claim One: Defendant has failed to do an adequate search.**

48. Plaintiff re-alleges and incorporates all preceding paragraphs.

49. Plaintiff's FOIA request reasonably described the records sought and was made in accordance with agency rules.

50. Defendant had a duty to construe the request liberally in its search to locate responsive records. *See Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).

51. There are documents that were clearly cited and relied on in the Defendant's review team's Memorandum that would constitute the type of records requested and that were not among documents provided.

52. Defendant's response that only 450 pages of responsive records were located is not supported by the fact that the trial transcript alone was 4,000 pages and U.S. Attorney Paul Becker's files reportedly filled nearly 40 boxes.

53. Therefore, Defendant has violated FOIA's mandate to make reasonable efforts to search for responsive records as required by 5 USC § 552(a)(3)(C).

**II.  Claim Two:  Defendant has failed to produce all responsive records.**

54. Plaintiff re-alleges and incorporates all preceding paragraphs.

55. Plaintiff properly asked for records within Defendant's control that relate to the review team's Memorandum.

56. Defendant is obligated to produce any records responsive to Plaintiff's request unless Defendant can justify a claim of statutory exemption, which must be narrowly construed. *Milner v. Dept. of Navy*, 562 U.S. 562, 565 (2011).

57. Defendant has not produced all the records in its possession that are responsive to Plaintiff's request.

58. Therefore, Defendant has violated its statutory duty to make agency records available in response to Plaintiff's request.  5 U.S.C. § 552(a)(3)(A).

### III. Claim Three: Defendant has failed to provide adequate justification for the exemptions it claims.

59. Plaintiff re-alleges and incorporates all preceding paragraphs.

60. In order to invoke an exemption to FOIA disclosure, Defendant must provide a specific, detailed explanation of why the exemption applies to the withheld materials. *Roth v. US Dept. of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011) (citing *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (1973)).

61. Because FOIA claims inherently involve one-sided information, case law is clear that only by knowing the justification of the exemptions invoked can Plaintiff and the Court apply adversarial testing of the agency's claims and challenge any flaws in the agency's reasoning. *Id.*; *see also Campbell v. U.S. Dept. of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).

62. When withholding records in their entirety, Defendant is obligated to demonstrate that the portions of the record that are exempt from disclosure are inextricably intertwined with non-exempt portions. *Ameren v. EPA*, 897 F.Supp.2d 802, 814 (E.D. Mo. 2012).

63. Defendant has offered no justification or explanation for the statutory exemptions relied on to withhold records in its possession that are responsive to Plaintiff's request.

64. For the 412 pages of records withheld in their entirety, Defendant's response simply states that one or more of the four exemptions cited above apply. In other words, no explicit application of any one of these exemptions is given and Plaintiff is left to guess which apply and on what basis.

65. For the 35 pages released in part, Defendant has supplied only a citation to the exemption it is relying on to justify the redactions, but without providing any explanation in support.

66. Moreover, the government misconduct asserted by the *Star* establishes more than a bare suspicion of misconduct as evidenced by the existence of the Defendant's review. *Nat'l Archives & Records Admin. v. Favish*, 541 US 157, 174 (2004).

67. Only by comparing the names and statements of the witnesses interviewed by the Defendant's review team to the witnesses' own voluntary statements published in the *Star* will it be possible to satisfy public interest in whether the agencies of the federal government engaged in misconduct. Otherwise, the public is left to take the federal agency at its word, despite being the very agency accused of misconduct.

68. Therefore, Defendant has violated its statutory duty to justify its refusal to make all requested agency records available to Plaintiff. 5 U.S.C. § 552(a)(3)(A), 5 U.S.C. § 552(a)(4)(B).

IV. **Claim Four: Even if support for the claimed exemptions exists, Defendant's withholdings and redactions are overly broad and fail to meet the requirements of segregability.**

69. Plaintiff re-alleges and incorporates all preceding paragraphs.

70. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such a record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b).

71. Defendant's effort to segregate non-exempt material is inadequate because there is a reasonable basis to conclude that at least some of the 412 pages of material withheld entirely contain non-exempt material that is not inextricably intertwined with exempt material. For example, the entire review was based on articles in the *Star* and these articles are presumably in the review team's files, but are in no way exempt. Any commentary by the review team about the articles, which may or may not be exempt, is easily segregable from the non-exempt article.

The same is true for the trial transcripts cited throughout the unredacted portions of the Memorandum. Incredibly, it appears that some of the redactions in the report may include material taken directly from the trial transcript.

72. Therefore, Defendant has violated its statutory duty to make a reasonable effort to segregate non-exempt agency records and make them available in response to Plaintiff's request. 5 U.S.C. § 552(a)(3)(A); 5 U.S.C. § 552(b).

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff prays that this Court:

A. order Defendant to disclose the entirety of the requested public records related to and including the July 8, 2011, Memorandum and any and all notes, recordings, and transcripts relating to the Defendant's review that produced that Memorandum;

B. order Defendant to provide support for the exemptions cited, including but not limited to the provision of an index of the materials withheld and unredacted records for this Court to inspect in camera;

C. award Plaintiff costs and reasonable attorney fees incurred in this action; and

D. grant such other relief as the Court may deem just and proper.

Dated: December 15, 2017

17
Case 4:17-cv-01037-ODS   Document 1   Filed 12/15/17   Page 17 of 18

Respectfully submitted,

/s/ *Stephanie S. Sankar*
SHOOK, HARDY & BACON LLP
Megan M. Egli, Mo. Bar No: # 60187
Stephanie S. Sankar, Mo Bar No.: # 61156
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
megli@shb.com
ssankar@shb.com
ATTORNEYS FOR PLAINTIFF BRYAN E. SHEPPARD